2014-5038

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

JEMAL'S LAZRIV WATER, LLC,

                        Plaintiff-Appellant,

v.

UNITED STATES,

                        Defendant-Appellee.

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
IN CASE NO. 12-151C, JUDGE THOMAS C. WHEELER

**BRIEF OF APPELLANT**

Lynn E. Calkins
Jerrold J. Ganzfried
Thomas J. McIntosh
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, D.C.  20006
Telephone:  (202) 955-3000
Facsimile:  (202) 955-5564
lynn.calkins@hklaw.com

*Counsel for Appellant*
*Jemal's Lazriv Water, LLC*

March 10, 2014

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Jemal's Lazriv Water, LLC certifies the following:

1.     The full name of every party or amicus represented by me is:  Jemal's Lazriv Water, LLC.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  Jemal's Lazriv Water, LLC.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.     The names of all law firms and the partners or associates that appeared for Jemal's Lazriv Water, LLC in the trial court  or agency or are expected to appear in this court are:  Lynn E. Calkins, Jerrold J. Ganzfried, Thomas J. McIntosh, and David S. Black (Holland & Knight LLP); Robert C. MacKichan, Jr. and Jacob W. Scott (formerly Holland & Knight LLP, currently Vedder Price P.C.); and Alice G. Haase (CastroHaase, PLLC).

  /s/ Lynn E. Calkins
Lynn E. Calkins
*Counsel for Appellant*
*Jemal's Lazriv Water, LLC*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES ..................................................................iv

STATEMENT OF RELATED CASES ..................................................1

JURISDICTIONAL STATEMENT ......................................................1

ISSUES PRESENTED FOR REVIEW ..................................................1

STATEMENT OF THE CASE.................................................................2

    A.    THE LEASES ...............................................................................3

    B.    TAX ADJUSTMENT CLAUSE AND TAX ASSESSMENTS OF THE PROPERTY .......6

    C.    PROCEEDINGS IN THE CLAIMS COURT .......................................10

SUMMARY OF ARGUMENT ..............................................................14

ARGUMENT ...........................................................................................16

    I.    STANDARD OF REVIEW.................................................................16

    II.    LESSOR IS ENTITLED TO JUDGMENT AS A MATTER OF LAW UNDER THE PLAIN TERMS OF THE LEASES..............................................18

        A.    The Court Misinterpreted the Definition of Full Assessment and Injected New Terms that Contradict the Plain Meaning. .......................18

            1. The Phrase "Considered All Contemplated Improvements" Should Be Given its Plain Meaning. ..............................................19

            2. The Court's Use of Parol Evidence to Interpret the Leases Is Inappropriate. ...................................................................20

            3. The Decisions Cited by the Claims Court Are Inapposite.................22

            4. The Claims Court's Interpretation Leads to Absurd Results. ............24

        B.    Under the Plain Meaning of Full Assessment, OTR Performed a Full Assessment in Tax Year 2007. ............................................28

    IV.    THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT.................31

        A.    The Claims Court Overlooked Evidence Contradicting Its Decision. ...32

            1. The Court Overlooked OTR's Use of Lease-Up Costs in Tax Year 2010. ..................................................................32

2. The Court Failed to Acknowledge that There Were No Supplemental Assessments to the Property..........................................34
3. The Court Disregarded Undisputed Evidence from OTR and Unrebutted Expert Opinion. ................................................36

B. The Court Relied on Inferences in the Government's Favor. ................37

1. The Court Improperly Inferred that Tenant Improvements Caused Increases in the Property's Assessed Value. ......................................38
2. The Court Adopted the Inference that Each Lease Contemplated a Fully Occupied Building with Tenant Improvements Completed Throughout the Entire Property.........................................................39
3. The Court Misconstrues the Nature of OTR's Lease-Up Cost Deductions. ......................................................................................41

CONCLUSION ..............................................................................................43

ADDENDUM ....................................................................................................

Judgment ...................................................................................................A1
Opinion and Order ....................................................................................A2

CERTIFICATE OF SERVICE ......................................................................

CERTIFICATE OF COMPLIANCE...............................................................

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

Alpena Marc, LLC v. United States,
    108 Fed. Cl. 200 (2012) ....................................................................22, 23

C. Sanchez & Son, Inc. v. United States,
    6 F.3d 1539 (Fed. Cir. 1993) ...............................................17, 32, 37

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) .........................................................................17

Foley Co. v. United States,
    11 F.3d 1032 (Fed. Cir. 1993) ..........................................................19

In re Wetzel,
    GSBCA No. 7466, 85-2 BCA (CCH) ¶ 18099, 1985 WL 16545 (Apr. 30,
    1985) .............................................................................................23, 24

Jay v. Sec. of Dept. of Health and Human Servs.,
    998 F.2d 979 (Fed. Cir. 1993) ..........................................................16

Jemal's Lazriv Water, LLC v. United States,
    114 Fed. Cl. 512 (2013) ...................................................................13

Kimbrell v. Fischer,
    15 F.3d 175 (Fed. Cir. 1994) ...............................................23, 24, 25

McAbee Constr. Inc. v. United States,
    97 F.3d 1431 (Fed. Cir. 1996) ...............................................19, 20, 27

McKay v. United States,
    199 F.3d 1376 (Fed. Cir. 1999) .................................................17, 37

Metric Constructors, Inc. v. Nat'l Aeronautics and Space Admin.,
    169 F.3d 747 (Fed. Cir. 1999) ..........................................................21

Northrop Grumman Info. Tech., Inc. v. United States,
    545 F.3d 1339 (Fed. Cir. 1993) .......................................................17

iv

*Rodolitz v. Neptune Paper Prods., Inc.*,
    239 N.E.2d 628 (N.Y. 1968)................................................................20

*Scott Timber, Co. v U.S.*,
    333 F.3d 1358 (Fed. Cir. 2003) ......................................................37

*Seaboard Lumber Co. v. United States*,
    308 F.3d 1283 (Fed. Cir. 2002) ......................................................16

*SunTiger, Inc. v. Scientific Research Funding Group*,
    189 F.3d 1327 (Fed. Cir. 1999) ......................................................16

*WDC West Carthage Assocs. v. United States*,
    324 F.3d 1349 (Fed. Cir. 2003) ......................................................20

*Wilner v. United States*,
    24 F.3d 1397 (Fed. Cir. 1994) ......................................................11

## STATUTES

28 U.S.C. § 1491 ................................................................................1

28 U.S.C. § 1295(a)(3)......................................................................1

41 U.S.C. § 7103(f)(5) ....................................................................10

41 U.S.C. § 7104................................................................................1, 11

D.C. Code § 47-829(d)-(e)................................................9, 12, 21, 23, 35

## OTHER AUTHORITIES

R. Ct. Fed. Cl. 56(c) ........................................................................17

11 James Wm. Moore, *Moore's Federal Practice* §
    56.07[3][a] (3d ed. 2013)................................................................16

2 *Real Estate Leasing Practice Manual* § 48:17 (2013)........................21

William F. Treanor & Raymond W. Goldfaden, *Challenges to Rent
Escalation Clauses in Commercial Leases, 4 Prob. & Prop.* (1990)................21

## STATEMENT OF RELATED CASES

No other appeal before this Court or any other appellate court has been taken from the civil action below. Counsel knows of no case pending in this or any other court that will directly affect or be affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

This is an action for damages against the United States following a contracting officer's denial of a certified claim. The United States Court of Federal Claims ("Claims Court") had jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491, and the Contract Disputes Act, 41 U.S.C. § 7104. The Claims Court entered final judgment on December 19, 2013. Plaintiff-Appellant Jemal's Lazriv Water, LLC ("JLW" or "Lessor") timely filed its notice of appeal on January 6, 2014. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## ISSUES PRESENTED FOR REVIEW

1. Whether the Claims Court erred in denying summary judgment to JLW and in granting summary judgment in favor of the Government despite undisputed facts that establish the first year of "full assessment," a term defined in the contracts between the parties, was no later than tax year 2007.

2.     Whether, on summary judgment, the Claims Court misconstrued the term "contemplated improvements" in a government lease to mean only "completed improvements."

## STATEMENT OF THE CASE

JLW and the General Services Administration ("GSA") are parties to a series of five leases that grant Defendant-Appellee United States (the "Government") the right to occupy space in JLW's commercial office building in Washington, D.C (the "Property").  A25 (Stip. ¶ 1).  The parties executed the leases over the course of approximately four years beginning June 2004, and each lease is for a different portion of the Property.  A25-26 (Stip. ¶ 2).

In the leases, the Government expressly promised to reimburse Lessor for certain expenses, including specified increases in real estate taxes as set forth in a "Tax Adjustment" clause.  A26 (Stip. ¶ 5).  The purpose of the Tax Adjustment clause is to allocate the risk of changes in real estate taxes so that Lessor's exposure is constant.  If taxes increase, the Government is responsible for its proportionate share of any increase.  If taxes decrease, the Government is entitled to a corresponding rental credit or payment.  *Id.*

Although real estate taxes increased annually from 2007 to 2010, GSA refused to pay any taxes.  A27, A35 (Stip. ¶¶ 11-12, 68-71).  Under the leases, the

Government's liability for real estate taxes depends on when the Property first received a full assessment, which, in turn, depends on whether the taxing authority "considered all contemplated improvements" in its assessment of the Property. A26-27 (Stip. ¶¶ 5-10).

The parties dispute the point at which the taxing jurisdiction first performed a full assessment. JLW maintains that the Property received a full assessment by tax year 2007 at the latest, several years after the execution of the first lease. The Government contends that the Property did not receive a full assessment for purposes of any of the leases until tax year 2010. The Claims Court denied JLW's motion for summary judgment and granted the Government's cross-motion for summary judgment. A10.

## A.    The Leases

Five separate leases grant the Government the right to occupy the Property, an office building at 1900 Half Street, S.W., Washington, D.C. Each lease is an independent agreement, and nothing in the leases contemplate any subsequent leases between the parties. *See* A123. The parties executed the leases over the course of almost four years, between June 2004 and May 2008. A25-26 (Stip. ¶ 2). Each lease is for an initial five-year term, and four of the leases also include an

additional five-year option held by the Government.  A145, A263, A377, A487, A601.

Each lease covers a specific portion of the Property and calls for Lessor to deliver "'vanilla' office space," which the Government can build out as it deems appropriate using a predetermined tenant improvement allowance.  *See, e.g.*, A156, (SFO[1]  ¶ 1.1(E)).  The leases state that "[i]t is the intent of the Government to lease a building shell with a Tenant Improvement Allowance." *See, e.g.*, A159 (SFO ¶ 1.7(E)(1)(A)).

The leases make clear that the Government dictates the scope and extent of any such tenant improvements:  "The Government, at its sole discretion, shall make all decisions as to the usage of the Tenant Improvement Allowance."  *See, e.g.*, A193 (SFO ¶ 9.2(A)(1)).  The Government decides whether to use all or a part of the allowance, or whether to forgo using any portion of the tenant improvement allowance in exchange for a decrease in rent. *See, e.g.*, *id.*

All tenant improvements associated with each lease were completed before the Government accepted that portion of the Property.  A32 (Stip. ¶ 43).   The following table provides the date of execution of each lease, the area subject to the

---

[1] The leases were negotiated pursuant to three separate Solicitations for Offers ("SFO") that were subsequently incorporated into the individual leases. *See, e.g.*, A148 & A153, *et seq.*

lease, and the date the Government accepted the space for each of the individual leases:

|  | GSA Lease No. GS-11B-01741 ("Lease 01741") | GSA Lease No. GS-11B-01816 ("Lease 01816") | GSA Lease No. GS-11B-01870 ("Lease 01870") | GSA Lease No. GS-11B-01937 ("Lease 01937") | GSA Lease No. GS-11B-02019 ("Lease 02019") |
|---|---|---|---|---|---|
| Execution Date | 6/2/2004 | 8/3/2005 | 9/19/2005 | 1/8/2007 | 5/14/2008 |
| Date of Acceptance | 1/28/2005 | 9/15/2006 | 11/8/2005 | 3/21/2007 | 9/22/2008 |
| Floor & Square Footage | 10th and 11th floors; 129,115 sq. ft. | 5th floor; 74,183 sq. ft. | 8th, 9th, and 10th floors; 130,000 sq. ft. | 8th floor; 35,367 sq. ft. | 7th floor; 69,102 sq. ft. |

A25-26 (Stip. ¶¶ 2-3); A145, A263, A377, A487, A601.

When the leases were being executed and the Government was taking possession, the area of the city where the Property is located was undergoing substantial change. According to the Capitol Riverfront Business Improvement District, the neighborhood experienced several key development milestones between 2005 and 2008, including:

- 2005-2006: The site for a new baseball stadium was selected and construction began in the Capitol Riverfront.

- 2007: New U.S. Department of Transportation headquarters opened, bringing 6,500 new employees to the neighborhood.

- 2008: Nationals Park opened.

5

A138; *see also* A128. All of this nearby development coincided with the time period in which the Government took possession of portions of the Property. *Compare*, *id.*, *with* A25-26 (Stip. ¶¶ 2-3). The logical consequence of this substantial change was an increase in values for real estate in the area, including the Property and the nearby Transpoint building located at 2100 Second Street, S.W., Washington, D.C.[2] *See* A119.

### B. Tax Adjustment Clause and Tax Assessments of the Property

In order to allocate the risk associated with changes in real estate taxes so that Lessor's exposure remains constant, the parties agreed that their relative obligation for real estate taxes would be determined by comparing the taxes imposed in a particular year against the "base year taxes." The "base year taxes" are a constant amount set once for each lease and then applied against the taxes due each year.

The leases define "base year taxes" as "the real estate taxes for the first 12-month period coincident with full assessment."[3] A26-27 (Stip. ¶ 7-8). The leases further define "full assessment" as follows:

_____

[2] The value of the Transpoint building followed the same trajectory as the Property. *See* A119.

[3] Four of the five leases also include an alternative methodology for establishing base year taxes, stating that "base year taxes . . . may be an amount negotiated by

6

> The term 'full assessment' . . . means that the taxing jurisdiction has considered all contemplated improvements to the assessed property in the valuation of the same. Partial assessments for newly constructed projects or for projects under construction, conversion, or renovation will not be used for establishing the Government's base year for taxes.

A27 (Stip. ¶ 10). These provisions were drafted by the United States and not modified by Lessor. A27 (Stip. ¶ 9).

Because the definition of "full assessment" and thus "base year taxes" are dependent on when the taxing jurisdiction considered all *contemplated* improvements, this case turns on the manner in which the Property was assessed by the local taxing jurisdiction, the D.C. Office of Tax and Revenue ("OTR"). The basic parameters of the assessment methodology OTR used in the relevant years—the so-called "income approach"—are not in dispute:

1) OTR estimates the property's potential gross income.

2) OTR then subtracts amounts related to market vacancy, expenses, and a reserve for replacement to determine the net operating income.

3) OTR applies an OTR-derived capitalization rate to the net operating income, yielding the stabilized value.

4) OTR next calculates the present value of the "lease-up costs."

5) OTR then subtracts the present value of lease-up costs from the stabilized value of the property to arrive at the market value of the commercial property.

6) The property owner can appeal the initial assessed value, which may result in a different final assessed value.

_____

the parties that reflects an agreed upon base for a fully assessed value of the property." A26-27 (Stip. ¶ 7). The negotiation method is not at issue in this case.

A30-31, A33 (Stip. ¶¶ 33, 39, 57-58); *see also, e.g.*, A719.

The "lease-up costs" used by OTR represent a market-based estimate of rent loss, the cost of tenant improvements, and lease commissions. A31 (Stip. ¶39); *see also, e.g.*, A101. OTR estimates such costs for space that is presumed vacant, as well as space that is occupied but subject to lease expiration within the next three years. *Id.* Thus, OTR uses lease-up costs to account for regular expenses associated with vacancy and tenant turnover in commercial properties. OTR also estimates the potential income generated by the rentable areas in the building, whether occupied or not. *See* A30-31 (Stip. ¶¶ 33-34, 38).

OTR must base its assessments on 100% of the market value of the property, and it uses the appraisal approach that provides the most credible opinion of value. A30 (Stip. ¶¶ 31-32). In doing so, "OTR considers all improvements required for the use of the assessed property." A30 (Stip. ¶ 28). This holds true for tax year 2007. In undisputed testimony, an OTR witness explained that, in preparing its tax year 2007 assessment, OTR "considered all improvements to the Property" and "considered one hundred (100) percent of the net rentable area of the Property." A31 (Stip. ¶¶ 36, 38). As confirmed by OTR's former Chief Assessor, "beginning with Tax Year 2007 . . . , the OTR assessed the [Property] at the fully assessed value . . . ." A30 (Stip. ¶ 29).

The lease-up costs used by OTR and the final assessed value of the Property for each tax year at issue were:

|  | Lease-up Costs[4] | Assessed Value[5] |
|---|---|---|
| Tax Year 2007 | $18,068,828 | $35,668,065 |
| Tax Year 2008 | $14,762,448 | $51,213,028 |
| Tax Year 2009 | $8,922,880 | $95,303,032 |
| Tax Year 2010 | $11,389,552 | $121,780,000 |

In tax years 2009 and 2010, OTR's lease-up costs included estimates not only for vacant space, but also for space that was currently occupied yet available to rent within the next three years.  A32 (Stip. ¶ 48), A101.

At no time during tax year 2006 through 2010 did the Property receive any supplemental assessments—a process OTR must perform when a property is undergoing substantial construction or being renovated.  A33 (Stip. ¶ 50, 53); *see* D.C. Code § 47-829(d)-(e).

---

[4] A32 (Stip. ¶¶ 44, 46, 48), A101.

[5] A35 (Stip. ¶¶ 68-71).

The parties agree that, if the Property received a full assessment in tax year 2007 and in every year thereafter, the "base year taxes" for each lease would be the taxes incurred during the following time periods:

- Lease 01741 - tax year 2007 (October 1, 2006, to September 30, 2007)

- Lease 01816 - tax year 2007 (October 1, 2006, to September 30, 2007)

- Lease 01870 - tax year 2007 (October 1, 2006, to September 30, 2007)

- Lease 01937 - first lease year (March 21, 2007, to March 20, 2008)

- Lease 02019 - first lease year (September 22, 2008, to September 21, 2008)

A28 (Stip. ¶ 15). If tax year 2007 and each year thereafter constituted full assessments, the leases entitle JLW to $2,240,884.74 in tax adjustments for 2008, 2009, and 2010 and accrued interest through April 17, 2013. A37 (Stip. ¶ 81).

## C.    Proceedings in the Claims Court

JLW filed certified claims with GSA demanding payment based on the fact that the Property received a full assessment in tax year 2007 and in every year thereafter. A27-28 (Stip. ¶¶ 13-14). GSA denied the claims,[6] and JLW sued in the Claims Court under the Contract Disputes Act, 41 U.S.C. § 7101, *et seq.*

---

[6] Four of the claims were rejected in written decision from a contracting officer, and the fifth is deemed denied as a matter of law because the contracting officer failed to respond within 60 days of submission. 41 U.S.C. § 7103(f)(5); A28 (Stip. ¶¶ 16-17). The courts review the claim presented to the contracting officer *de*

At the conclusion of discovery, the Claims Court directed the parties to base any motions for summary judgment on stipulated facts. A23. To that end, the Government and JLW filed a Joint Stipulation of Uncontroverted Facts setting forth facts on which the parties agreed, but omitting facts disputed by either party. A25-37. JLW and the Government then filed cross-motions for summary judgment, presenting the Claims Court with the central question: When did OTR first perform a full assessment by considering "all contemplated improvements" to the Property?

JLW moved for summary judgment based on the undisputed evidence from OTR indicating that the Property received a full assessment in tax year 2007 and every year thereafter. This undisputed evidence includes sworn statements from OTR's former Chief Assessor that "OTR considers all improvements required for the use of the assessed property in the valuation of the same" and that "beginning with Tax Year 2007 . . . the OTR assessed the [Property] at the fully assessed value." A30 (Stip. ¶¶ 28-29). In addition, JLW submitted further undisputed testimony from OTR demonstrating that, in tax year 2007, OTR considered all improvements to the Property and considered 100% of the net rentable area of the Property. A30-31 (Stip. ¶¶ 30, 36, 38).

---

*novo*, without any deference to the agency's factual findings. 41 U.S.C. § 7104(b); *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994).

JLW also offered an unrebutted expert opinion that the Property received a full assessment by tax year 2007 at the latest. A35-36 (Stip. ¶¶ 72-73, 78). The Government did not offer any expert opinion on OTR's assessments or any other issue. A37 (Stip. ¶ 83).

In moving for summary judgment, JLW also explained the significance of the fact that the Property did not receive any supplemental assessments during the relevant period. *See* A53 (Stip. ¶ 53). Supplemental assessments are a statutory process used by the District of Columbia to update assessments of properties undergoing construction or renovation. A53 (Stip. ¶ 40); D.C. Code § 47-829(d)-(e). They apply in circumstances that closely mirror the leases' definition of "partial assessment," a concept the leases use to clarify the type of assessments that do not qualify as "full." *Compare* D.C. Code § 47-829(d)-(e), *with* A27 (Stip. ¶ 10).

The Government's cross-motion for summary judgment urged the Claims Court to discount the testimony of OTR and JLW's expert and to rule that the first year of full assessment was tax year 2010. *See* A75-79. The Government did not offer any expert evidence of its own, and it did not dispute the substance of OTR's testimony. *See* A37 (Stip. ¶ 83). Rather, the Government posited that OTR's use of "lease-up costs" in tax years 2007, 2008, and 2009 meant that no full assessment was made until 2010. A72. The Government also argued that the leases' express

reference to "contemplated improvements" should be interpreted to require OTR's consideration of "completed improvements." A73-75. The Government further interpreted full assessment as requiring completion of all tenant improvements in tenant spaces throughout the building, not just the space to be occupied under each particular lease. *See* A76.

In opposing the Government's motion, JLW explained that the leases spoke only in terms of "contemplated improvements." Therefore, the Government's reference to "completed improvements" injected a new and different term that had no basis in the contract. A88-91. Moreover, JLW demonstrated that OTR applied lease-up costs in tax year 2010 just as it had in prior years, a fact which renders the Government's interpretation of full assessment and its proposed base year internally inconsistent. A94-95, A101. JLW also highlighted the fact that the leases specify the delivery of "'vanilla' office space," leaving the nature and scope of any additional tenant improvements to the Government's sole discretion. A118; *see, e.g.*, A156 & A193 (SFO ¶ 1.1(E) & SFO ¶ 9.2(A)(1)).

The Claims Court denied JLW's motion for summary judgment and granted summary judgment in favor of the Government. A2-10, *Jemal's Lazriv Water, LLC v. United States*, 114 Fed. Cl. 512 (2013). Agreeing with the Government's interpretation of "full assessment," the Claims Court interpreted the provision regarding OTR's consideration of "contemplated improvements" to require

13

consideration of "completed improvements."  A6-9.  On that basis, the Claims Court concluded that the first point at which OTR could have considered all *completed* tenant improvements in the Property was tax year 2010.  A9.[7]

The court's analysis did not address several uncontested facts that were at odds with its conclusion, including:

- OTR's continued use of lease-up costs in tax year 2010;[8]

- OTR's testimony that, in tax year 2007, it "assessed the [Property] at the fully assessed value . . ."; "considered all improvements to the Property"; and "considered one hundred (100) percent of the net rentable area";

- The lack of supplemental assessments during the years in question; and

- Lessor's unrebutted expert testimony.

## SUMMARY OF ARGUMENT

The lease language clearly looks to the taxing jurisdiction to determine whether a full assessment occurred.  Undisputed evidence from OTR shows that the taxing jurisdiction fully assessed the Property  in tax year 2007.  Accordingly, summary judgment should have been entered in favor of JLW.  In reaching a contrary result, the Claims Court's decision contradicts the plain language of the

---

[7] The court also agreed with the Government's contention that OTR's use of lease-up costs was inconsistent with a "full assessment."  A7.

[8] In a table providing assessment figures for the years in question, the Claims Court's decision lists 2010 lease-up costs as "Not provided."  A4.  *But see* A101 (assessment worksheet showing 2010 lease-up costs).

leases, discounts sworn statements from OTR, ignores unrebutted expert opinion, adopts a series of inferences in favor the Government, and overlooks undisputed evidence that precludes its decision.

The Claims Court erred by misinterpreting the definition of "full assessment" and then disregarding undisputed, material facts establishing the existence of a full assessment in tax year 2007. Instead of adhering to the plain language of the leases that address whether the taxing jurisdiction considered all "contemplated improvements," the Claims Court construed the leases to require the taxing jurisdiction's consideration of "completed improvements." There is no basis in the text or the record to add new terms to the unambiguous definition of full assessment. Applying the proper interpretation of the leases and the undisputed evidence of OTR's assessments, it cannot be disputed that tax year 2007 was the first year of full assessment. Accordingly, JLW is entitled to summary judgment.

Even if the Claims Court were correct to discount OTR's undisputed testimony and to re-write the leases—which it was not—material factual disputes nonetheless should have prevented judgment in the Government's favor. In entering summary judgment for the Government, the court overlooked critical facts, including the presence of lease-up cost deductions in tax year 2010, the lack of any supplemental assessments, and the undisputed evidence from OTR and

unrebutted expert opinion regarding the 2007 assessment. Furthermore, the Claims Court's decision relies on several impermissible inferences in the Government's favor—the most egregious being the assumption that the assessed value of the Property increased due to the completion of tenant improvements related to the Government's tenancy. Such an inference is not only inappropriate on summary judgment, it is belied by the record. The Government's motion for summary judgment should have been denied.

## ARGUMENT

### I.    STANDARD OF REVIEW

Where, as here, summary judgment raises only questions of law, the grant and denial of summary judgment are reviewed *de novo*.[9]  *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1292 (Fed. Cir. 2002); *Jay v. Sec. of Dept. of Health and Human Servs.*, 998 F.2d 979, 982 (Fed. Cir. 1993).   The trial court's

---

[9] This Court has also recognized that in limited circumstances the trial court has discretion to deny summary judgment if policy considerations warrant, even if the moving party otherwise demonstrates its entitlement to judgment as a matter of law. *SunTiger, Inc. v. Scientific Research Funding Group*, 189 F.3d 1327, 1333 (Fed. Cir. 1999) (citing 12 James Wm. Moore, *Moore's Federal Practice* § 56.41[3][d] (3d ed. 1999)).   Such policy considerations—which include the need for further pretrial activity or trial to sharpen the issues, or the need for additional factual development—are not present with respect to the denial of JLW's motion for summary judgment. *See* 11 James Wm. Moore, *Moore's Federal Practice* § 56.07[3][a] (3d ed. 2013).

interpretation of a contract is also reviewed *de novo*. *Northrop Grumman Info. Tech., Inc. v. United States*, 545 F.3d 1339, 1343 (Fed. Cir. 1993).

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." R. Ct. Fed. Cl. 56(c). The moving party may demonstrate its entitlement to summary judgment by showing that there is an absence of evidence to support the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). On summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *McKay v. United States*, 199 F.3d 1376, 1380 (Fed. Cir. 1999). "When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving reasonable inferences against the party whose motion is under consideration." *Id.*

When the interpretation of a contract is at issue, "judgment can not be sustained in favor of the movant unless there is no version of the facts that could support a contract interpretation in favor of the nonmovant." *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1544 (Fed. Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

## II. LESSOR IS ENTITLED TO JUDGMENT AS A MATTER OF LAW UNDER THE PLAIN TERMS OF THE LEASES.

The Government's liability flows from the clear and unambiguous requirements of the leases. The Government does not dispute that the leases require the Government to pay its proportionate share of any increase over the base year taxes. A26 (Stip. ¶ 5). It also does not dispute that Lessor timely submitted documentation requesting reimbursement for such taxes. A27 (Stip. ¶11).

There is no basis in the language of the leases, or in the record, for the Claims Court's ruling that the Government need not reimburse Lessor for taxes because the Property did not receive a "full assessment" until tax year 2010. Under the plain language of the leases, the taxing jurisdiction's assessment methodology determines whether a full assessment occurred. In this case, undisputed evidence—including testimony from the taxing jurisdiction, stipulations, and unrebutted expert opinion—establishes a full assessment no later than tax year 2007. Accordingly, the Claims Court erred in denying JLW's motion for summary judgment.

### A. The Court Misinterpreted the Definition of Full Assessment and Injected New Terms that Contradict the Plain Meaning.

The Claims Court's denial of JLW's motion for summary judgment is based on a misinterpretation of the defined contractual term, "full assessment." The

leases contain a clear, straightforward definition: "The term 'full assessment' . . . means that the taxing jurisdiction has considered all contemplated improvements to the assessed property in the valuation of the same." A27 (Stip. ¶10). The court's decision fundamentally alters this definition by supplying new terms that contradict the actual language in the leases. The Claims Court found that a full assessment occurs not when the taxing jurisdiction "considered all contemplated improvements" as the leases unambiguously provide, *id.*, but only when the taxing jurisdiction has considered all "completed improvements." A10 The court's departure from the plain language is unwarranted.

> 1. The Phrase "Considered All Contemplated Improvements" Should Be Given its Plain Meaning.

It is not necessary—and is indeed legally incorrect—to stretch the meaning of the text and engraft new, extra-contractual terms onto the Tax Adjustment clause. Contract interpretation begins with the plain language of the agreement. *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993). If the provisions are clear and unambiguous, they must be given their ordinary meaning, and the court may not resort to extrinsic evidence to interpret them. *McAbee Constr. Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996).

This bedrock tenet of contract interpretation applies to the Tax Adjustment clause's definition of full assessment. To ask whether the taxing jurisdiction's

19

valuation "considered all contemplated improvements" simply asks whether OTR's assessment took into account improvements anticipated under the particular lease, without regard to whether the improvements are completed. This straightforward interpretation provides a sensible, workable definition of full assessment. GSA is a sophisticated tenant, and it should not be permitted to rewrite a provision it drafted in the first instance simply to avoid the financial consequences of contractual terms to which it agreed. *See* A27 (Stip. ¶ 9).

2. The Court's Use of Parol Evidence to Interpret the Leases Is Inappropriate.

In departing from the express language of the leases, the Claims Court referenced two secondary sources on commercial leasing. As an initial matter, it is unnecessary and inappropriate to resort to trade usage or other extrinsic evidence to interpret the unambiguous, expressly defined terms of the Tax Adjustment clause.[10] *McAbee Constr.*, 97 F.3d at 1435 (". . . [T]he court may not resort to extrinsic evidence to interpret [unambiguous terms]."); *see also Rodolitz v. Neptune Paper Prods., Inc.*, 239 N.E.2d 628, 630 (N.Y. 1968) (rejecting an

---

[10] Even if the term "full assessment" were ambiguous, it would not permit the reading adopted by the Claims Court. "[I]t is well established that the rule of contra proferentem requires that such ambiguity be construed against the government as the drafter of the subject leases." *WDC West Carthage Assocs. v. United States*, 324 F.3d 1349, 1364 n.2 (Fed. Cir. 2003). It is undisputed that the Government drafted the Tax Adjustment clause. A27 (Stip. ¶ 9).

interpretation of a tax escalation clause that was at odds with the "clearly expressed language of the contract"). "[A] court should accept evidence of trade practice only where a party makes a showing that it relied reasonably on a competing interpretation of the words when it entered into the contract." *Metric Constructors, Inc. v. Nat'l Aeronautics and Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999). If no such showing is made, trade usage "will not overcome the clear language of the contract." *Id.* The Government made no attempt to demonstrate that, in entering into the leases, it understood "contemplated improvements" to mean "completed improvements" in the vernacular of commercial real estate professionals.

In any event, the secondary sources cited by the Claims Court merely express the unremarkable proposition that assessments of partially-constructed buildings may be problematic if used to establish the base year. 2 *Real Estate Leasing Practice Manual* § 48:17 (2013); William F. Treanor & Raymond W. Goldfaden, *Challenges to Rent Escalation Clauses in Commercial Leases*, 4 Prob. & Prop., May/June 1990, at 6-7. Of course, the leases already expressly address this concern by prohibiting base years established by "partial assessments" for "newly constructed projects or for projects under construction, conversion, or renovation," none of which applied to the Property during the relevant years. A27, 33 (Stip. ¶¶ 10, 50, 53, 56); D.C. Code § 47-829(d)-(e).

### 3.    The Decisions Cited by the Claims Court Are Inapposite.

There is no merit to the Claims Court's view that prior decisions and secondary sources support its decision to read a "completed improvements" requirement into the full assessment definition.  The cited authorities simply stand for the notion that a full assessment should not ignore the value of improvements anticipated by the lease.  This begs the question.  The crux of the issue is whether the taxing jurisdiction considered the value associated with the contemplated improvements.  In this case, it is undisputed that OTR did, in fact, consider all improvements required for the Property's intended use as a commercial office building.  *See* A30-31 (Stip. ¶¶ 28-29, 36, 38).  Furthermore, each of the decisions cited by the Claims Court involved a situation where the property was being converted to a new use, which is not the situation here.  *See* A30, A32 (Stip. ¶¶ 29, 53).

In *Alpena Marc, LLC v. United States*, 108 Fed. Cl. 200 (2012), a renovation caused the assessed taxes to jump abruptly—from $1,161.62 to $74,307.11—as the property was converted from a former paper mill into office space.  *Id.* at 202, 204.  The case recognizes that a full assessment requires the taxing jurisdiction to consider the value of the property as contemplated by the leases, which in that case meant an assessment that valued a renovated office building instead of a former paper mill.  *See id.* at 206.  As the Court recognized in *Alpena Marc*, the standard

Tax Adjustment clause expressly prohibits base years based on "partial assessments for projects under renovation" for this reason.  *See* A27 (Stip. ¶ 10); *Alpena Marc*, 108 Fed. Cl. at 206.  In this case, however, the Property was not being renovated or converted in tax year 2007.[11]  It was a commercial office building throughout the relevant time period, and the taxing jurisdiction valued it as such.  A30-31 (Stip. ¶¶ 28-29, 38).

In *Kimbrell v. Fischer*, 15 F.3d 175 (Fed. Cir. 1994), this Court confronted a dynamic similar to *Alpena Marc*.  *Kimbrell* ruled that a tax assessment that considered the value only of an unimproved parcel of land, and not the value of the building contemplated by the parties' lease, did not constitute a full assessment. *Id.* at 177-78.  This is clearly a different factual scenario than presented here, where it is undisputed that the taxing jurisdiction assessed a commercial office building, and considered "all improvements required for the use of the assessed property" including "one hundred (100) percent of the net rentable area of the Property."  A30-31 (Stip. ¶¶ 28-29, 38).  Similarly, in *In re Wetzel*, GSBCA No. 7466, 85-2 BCA (CCH) ¶ 18099, 1985 WL 16545 (Apr. 30, 1985), the General Services Board of Contract Appeals ("GSBCA") considered the assessment of a property for which "renovations were begun for converting warehouse spaces to

---

[11] If the Property were under renovation during this time period, OTR would have been required by statute to perform a supplemental assessment.  D.C. Code § 47-829(d)-(e).  The parties stipulated that no supplemental assessments occurred from 2006 through 2010. A33 (Stip. ¶ 53); *see infra* pp. 34-36.

commercial office spaces." *Id.* at *1. Relying on the particular manner in which the property at issue was assessed by taxing authorities in Texas, the GSBCA concluded that a full assessment could not have been rendered until after completion of tenant improvements. *Id.* at *3-4.

*Kimbrell* and *Wetzel* are inapposite for an additional, more fundamental reason. Neither case involved a lease that contained an explicit definition of "full assessment," and they certainly did not address the meaning of the lease terms at issue here. *Kimbrel*, 15 F.3d at 176; *Wetzel*, 1985 WL 16545, at *2. Indeed, *Wetzel* specifically remarked that "[i]t is possible for parties to agree on a different interpretation of the term 'first year of a full assessment' . . . ." *Wetzel*, 1985 WL 16545, at *4. In this case, the parties did agree on a definition of full assessment, and it is the language of these leases that governs. There is no federal common law of tax adjustments. The parties' obligations depend on the language of the particular leases at issue, not prior cases analyzing different leases under vastly different factual scenarios.

4.      The Claims Court's Interpretation Leads to Absurd Results.

The Claims Court's interpretation of full assessment is contrary to the express lease terms. It is, moreover, contrary to the underlying intent of the leases and would produce absurd results. The basic purpose of the Tax Adjustment

clause is "to pass through certain increases in real estate property taxes to the government in the form of rent adjustments." *Kimbrell*, 15 F.3d at 177. The Claims Court's interpretation, however, creates the illogical possibility that full assessment may never occur, insulating the Government from responsibility for tax increases despite the clear contractual language and intent to the contrary.

Specifically, the Claims Court concluded that full assessment cannot occur until the completion of all tenant improvements throughout the Property, which the court found was tax year 2010 for all the leases. A10. The court's interpretation raises two intractable dilemmas. First, because it requires completion of tenant improvements throughout the Property, the Claims Court's interpretation means that "contemplated improvements" in earlier leases include hypothetical tenant improvements under future leases that are not yet in existence. This is not merely a theoretical concern, but the actual dynamic at issue here. The Claims Court concluded that a full assessment for purposes of Lease 01741—which was executed in June 2004—depended on OTR's consideration of completed tenant improvements under a lease executed in May 2008, which in the court's view did not occur until tax year 2010. A6 n.7, A10; A25-26 (Stip. ¶ 2-3). In fact, it is undisputed that all of the tenant improvements contemplated in Lease 01741 were actually completed by 2005. A26, A32 (Stip. ¶¶ 3(a), 43)

Second, under the Claims Court's reading, the Property may never receive a full assessment during the lease term or, if it does, the Property may fall in and out of full assessment. Commercial office buildings frequently experience vacancy and tenant turnover, each of which may lead to additional tenant improvements. OTR addresses the reality of ongoing tenant improvements by applying lease-up cost deductions whenever there is any vacant space in the building or whenever any lease in the building is set to expire within three years of the valuation date. A31 (Stip. ¶ 39). But, if a full assessment could not occur until all future tenant improvements were completed in all portions of the building, then full assessment would become, as a practical matter, unattainable. Again, this risk is not merely theoretical. The Claims Court concluded that the base year for tax adjustment purposes was tax year 2010[12]—meaning the first tax adjustment would not occur until tax year 2011, at the earliest—but the Government's initial period of tenancy for Lease 01741 ended in January 2010. A26 (Stip. ¶ 3(a)); Lease 01741 ¶ 2, A145. The combination of the Claims Court's interpretation and OTR's unique methodology creates the prospect that full assessment will never occur during a particular lease term.

---

[12] Moreover, as explained *infra* at pp. 32-34, under the Claims Court's interpretation, OTR's use of lease-up costs in tax year 2010 should have prevented a full assessment even in 2010.

The absurdity of such a result underscores the error of the Claims Court's interpretation. Under the plain meaning of the leases, "contemplated improvements" mean the tenant improvements intended by the particular lease at the time it was executed, not hypothetical improvements to be made under future leases the parties may or may not consummate. And the taxing jurisdiction has "considered" tenant improvements when it takes their value into account, which depends on OTR's actual methodology, not the Government's construction schedule. In fact, OTR's income approach considers the value associated with tenant improvements when it calculates the Property's potential gross income, taking into account 100% of the rentable area. *See* A30-31 (Stip. ¶¶ 33, 38).

A contract must be interpreted "in a manner that gives meaning to all of its provisions and makes sense." *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996). Yet, the Claims Court's interpretation carries the potential to read the Tax Adjustment clause out of the leases altogether in situations where the Government rents a portion of a property or where its occupancy is piecemeal. The definition of full assessment is plain on its face, without the need to inject additional, non-contractual terms like "completed improvements." The error in the Claims Court's interpretation of defined contractual language permeates its denial of JLW's motion for summary judgment and its grant of summary judgment in

favor of the Government.  Under settled principles, the judgment should be reversed.

### B.    Under the Plain Meaning of Full Assessment, OTR Performed a Full Assessment in Tax Year 2007.

If the undisputed facts are applied to the plain meaning of the leases, as they must be under the governing summary judgment standards, JLW is entitled to judgment as a matter of law.  The leases assign responsibility for real estate taxes based on the "base year taxes."  Base year taxes are "the real estate taxes for the first 12-month period of the lease term coincident with full assessment."  The leases define "full assessment" in terms of whether "the taxing jurisdiction considered all contemplated improvements to the assessed property."  Thus, the unambiguous terms of the leases look to the factors considered by the taxing jurisdiction to determine whether a full assessment occurred.

In this case, undisputed evidence from OTR establishes a full assessment in tax year 2007.  As stated in the affidavit of OTR's former Chief Assessor, David Fitzgibbon, OTR assesses commercial property at 100% of the estimated market value and, "in doing so, the OTR *considers all improvements required for the use of the assessed property* in the valuation of the same."  A30 (Stip. ¶¶ 27-28) (emphasis added).  Moreover, "beginning with Tax Year 2007 (October 1, 2006 - September 30, 2007) and continuing to the present, the OTR assessed the

commercial office building known as Jemal's Riverside located at 1900 Half Street, SW, Washington, DC 20024 . . . *at the fully assessed value*, using the income approach." A30 (Stip. ¶ 29).

Stipulations and other undisputed portions of the record further demonstrate that a full assessment occurred in tax year 2007. In using the income approach to value the Property, OTR considered all improvements to the Property and considered one hundred (100) percent of the net rentable area of the Property in tax year 2007. A31 (Stip. ¶¶ 34, 36, 38). In other words, OTR considered the revenue-generating potential—and, hence, value—of all rentable space in the building in tax year 2007, whether occupied or not.

If anything further were needed to demonstrate the error in the Claims Court's decision, it is provided by the expert opinion of Hal Horstman.[13] Mr. Horstman opined that OTR considered all contemplated improvements not only in tax year 2007 and in each year thereafter, but in tax year 2006 as well. A36 (Stip. ¶¶ 73-74, 78). The Government elected not to offer any competing expert opinion and left Mr. Horstman's conclusions unrebutted. A37 (Stip. ¶ 81).

---

[13] Lessor offered Mr. Horstman's opinion on the issue of when the taxing jurisdiction considered all contemplated improvements in its assessment of the Property. A36 (Stip. ¶ 73). Mr. Horstman has been a licensed appraiser for more than 30 years and is a member of the International Association of Assessing Officers. A36 (Stip. ¶¶ 76-77).

This undisputed record should be dispositive on the central question posed by the leases—whether the taxing jurisdiction's assessment considered all contemplated improvements in tax year 2007. But the Claims Court's decision is functionally silent on this pivotal evidence.

From this robust record demonstrating a full assessment in tax year 2007, the only fact addressed by the court's analysis is the fact that "OTR considers all improvements required for the use of the assessed property." A7 (citing A30 (Stip. ¶ 28)). The court incorrectly discounted this undisputed description of OTR's actual practice from OTR's former Chief Assessor on the grounds that "[t]he full assessment term is a contractual term used by the parties, and is not automatically dependent upon the labels used by the taxing jurisdiction to describe its assessment methodology." A8. But the contractual term "full assessment" expressly looks to the taxing jurisdiction for meaning, and it necessarily turns on the factors considered by OTR in its assessment of the Property. *See* A27 (Stip. ¶ 10). Indeed, in the context of these leases, for this Property, within this taxing jurisdiction, the contractual term can have no other meaning.

In addition to writing off OTR's description of its own assessment methodology, the Claims Court's decision did not even acknowledge other material evidence about how the Property was actually assessed in tax year 2007. There is no mention of OTR's testimony that, in tax year 2007, it "assessed the

30

[Property] at the fully assessed value . . ."; "considered all improvements to the Property"; and "considered one hundred (100) percent of the net rentable area." A30-31 (Stip. ¶¶ 29, 36, 38). The decision similarly fails to acknowledge Mr. Horstman's unrebutted expert opinion.

The Claims Court's fulcrum for discounting large swaths of the record was its misinterpretation of the plain language of the leases. By redefining the "full assessment" to require the consideration of completed improvements, the court transformed the full-assessment inquiry from an analysis of OTR's assessments to a review of the Government's occupancy schedule. This is incorrect. Applying the plain lease terms to the undisputed facts, the Property received a full assessment in tax year 2007, and JLW is entitled to judgment as a matter of law.

## IV.    THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT.

Even if the undisputed material evidence and the plain lease terms did not require summary judgment in JLW's favor, there is no basis for entry of summary judgment for the Government. In ruling that the Property received its first full assessment in tax year 2010, the court ignored undisputed record evidence, adopted inferences in favor of the Government, and misconstrued the lease terms. The Claims Court's decision is at odds with the standards for summary judgment and should be reversed.

## A. The Claims Court Overlooked Evidence Contradicting Its Decision.

Summary judgment should not be granted if there is a genuine dispute of material fact. *See C. Sanchez & Son*, 6 F.3d at 1541, 1544-45. Although the parties based their motions for summary judgment on stipulated facts, disputes as to material facts outside the stipulations undermine the Government's case. JLW offered probative admissible evidence that the Claims Court failed to acknowledge, but which directly contradicted the Government's theory of the case and the court's decision. Proper consideration of this evidence leads, at the very least, to a material dispute as to the Claims Court's conclusion that the Property did not receive a full assessment until tax year 2010.

### 1. The Court Overlooked OTR's Use of Lease-Up Costs in Tax Year 2010.

The Claims Court's decision overlooks the fact that OTR applied lease-up costs in tax year 2010, just as it had in prior years. This is material because the Government argued—and the court agreed—that OTR's use of lease-up cost deductions was inconsistent with full assessment. *See* A7, A72. Indeed, the Government criticized JLW for suggesting that a full assessment could occur despite OTR's use of lease-up costs in tax years 2007, 2008, and 2009 and, in doing so, characterized JLW's position as allowing for a full assessment when

32

OTR merely "acknowledge[s] that there are contemplated improvements to the property which have yet to be completed." A72. The Claims Court agreed and adopted the Government's characterization virtually verbatim: "According to Plaintiff's interpretation, OTR has considered the improvements to the property if OTR acknowledges that there are contemplated improvements to the property which have yet to be completed." *Compare* A6, *with* A72. This distinction between OTR's consideration of "completed" tenant improvements and "yet to be completed" tenant improvements, as represented by lease-up costs, forms the basis for the finding that tax year 2010 was the first year of full assessment. *See* A6-7, A10. The rationale for the Claims Court's decision falls under its own weight.

On this record, the presence or absence of lease-up cost deductions cannot be a defining characteristic of a full assessment. Undisputed facts show that OTR applied lease-up cost deductions not only in tax years 2007, 2008, and 2009, but in tax year 2010 as well. The Claims Court not only failed to acknowledge this critical fact, its decision reveals that the court overlooked that the fact even existed in the record. A table in the court's decision lists the annual real estate taxes, the assessed value of the Property, the amount of vacant space, and the lease-up costs for tax years 2007 through 2010. A4. The table states that 2010 lease-up costs were "Not provided." *Id.* But JLW provided this information during briefing, and it was not disputed. A94-95, A101, A111.

This oversight is not a mere technicality, but a critical flaw in the Claims Court's analysis. If lease-up costs prevent a full assessment, then the Claims Court's finding that tax year 2010 was the first year of full assessment cannot stand. Indeed, if lease-up costs prevent a full assessment, then the Property—and all other office buildings in Washington, D.C.—may never be fully assessed because lease-up costs are a routine part of OTR's methodology. *See* A31 (Stip. ¶ 39). This is contrary to the parties' intent and, perhaps more troubling, suggests that full assessment does not depend on the improvements contemplated by the leases. This cannot be the case because it contradicts the express language of the leases.

2. <u>The Court Failed to Acknowledge that There Were No Supplemental Assessments to the Property.</u>

The central issues in this case involve the meaning of "full assessment" and how it interacts with OTR's assessment methodology. Yet, the court below ignored a concept at the very crossroads of the lease terms and OTR's methods— the "supplemental assessment."

The leases clarify the meaning of "full assessment" by providing examples of "partial assessments" that do not qualify:

> Partial assessments for newly constructed projects or for projects under construction, conversion, or renovation will not be used for establishing the Government's base year for taxes.

A27 (Stip. ¶ 10).  The District of Columbia has a recognized process for assessing

real estate containing newly-constructed improvements, renovations, conversions

and ongoing construction, which is called a "supplemental assessment":

> The Mayor shall assess the estimated market value of all real property
> . . . if since the last annual or supplemental assessment:
>     (1) (A) A new improvement has been constructed;
>         (B) An addition to or renovation of an existing improvement
>         has been constructed;
>         (C) There is construction in progress . . . ; or
>         (D) A conversion has occurred; and
>     (2) There is a $100,000 change in the estimated market value of
>         the real property [or a certificate of occupancy has been issued].

*See* D.C. Code § 47-829(d)-(e); A33 (Stip. ¶ 50).  It is undisputed that the Property

did not receive a supplemental assessment in tax years 2006, 2007, 2008, 2009, or

2010. A33 (Stip. ¶ 53).  The lack of a supplemental assessment in 2007 and in

subsequent years demonstrates that tax year 2007 was not a "partial assessment" as

the leases define the term.  Therefore, tax year 2007 could be used to establish the

base year taxes.  Despite the clear relevance of supplemental assessments to the

central issue in the case, the decision makes no mention of the undisputed—

indeed, stipulated—fact that a supplemental assessment did not occur in tax year

2007.

The supplemental assessment process is relevant for an additional reason.  It

eviscerates the premise for the Claims Court's view that JLW's lease interpretation

would mean that "[a]ny tax assessment by the OTR . . . will qualify as a full

35

assessment . . . ." A7. Unlike the court's reading, JLW's interpretation gives effect to the term "partial assessment" and recognizes that there is a whole class of assessments performed by OTR that are categorically excluded from the universe of *full* assessments. The tax year 2007 was not such a partial or supplemental assessment, and it was capable of serving as the base year.

3.   The Court Disregarded Undisputed Evidence from OTR and Unrebutted Expert Opinion.

The existence of a full assessment turns on what OTR considered, and when. Notwithstanding the taxing jurisdiction's central role under the leases, the Claims Court's decision fails to acknowledge evidence from OTR that in 2007 the taxing jurisdiction: "assessed the [Property] at the fully assessed value . . ."; "considered all improvements to the Property"; and "considered one hundred (100) percent of the net rentable area." A30-31 (Stip. ¶¶ 29, 36, 38). The decision also omits any mention of JLW's unrebutted expert opinion that the Property received a full assessment in 2006, in 2007, and in every year thereafter. A36 (Stip. ¶¶ 73-74, 79). In addition to dispositive facts that were ignored altogether, the Claims Court also dismissed as mere "labels" evidence that OTR, as a matter of undisputed fact, "considers all improvements required for the use of the assessed property." A7 (citing A30 (Stip. ¶ 29)).

On cross-motions for summary judgment, the court must evaluate each motion on its own merits. *McKay*, 199 F.3d at 1380. The evidence of the nonmovant is to believed, not ignored. *C. Sanchez & Son*, 6 F.3d at 1541; *see also id.* at 1544 ("[T]he nonmovant's version of the underlying facts must be believed, and judgment can not be sustained in favor of the movant unless there is no version of the facts that could support a contract interpretation in favor of the nonmovant.").

The evidentiary record in this case demonstrates that the Property received a full assessment by tax year 2007 at the latest. It follows *a fortiori* that there is, at the very least, a genuine issue as to the Government's untenable contention that the first full assessment was not made until tax year 2010. These material disputes preclude summary judgment in favor of the Government.

## B. The Court Relied on Inferences in the Government's Favor.

In addition to failing to acknowledge material facts that preclude judgment in the Government's favor, the court also based its summary judgment decision on unsupported inferences. This was erroneous. Not only must the court accept the truth of the nonmoving party's evidence, it must also draw all justifiable inferences in its favor. *Scott Timber*, *Co. v. U.S.*, 333 F.3d 1358, 1364 (Fed. Cir. 2003).

The Claims Court did just the opposite, basing its decision on the Government's unsupported assumptions about OTR's assessment methodology rather than on undisputed facts and not drawing justifiable inferences in JLW's favor.

>  1.    The Court Improperly Inferred that Tenant Improvements Caused Increases in the Property's Assessed Value.

In the Claims Court's view, the Property's assessed value increased from 2007 through 2010 "because OTR's 2007 assessment was of a completely vacant building in need of significant improvements to attract tenants" and "such improvements increased both the value of the building and the taxes assessed by OTR." A10.  There are no facts in the record to support that inference.  OTR certainly did not testify as much, and the Government offered no expert to support the inferred connection between increased assessed value and the completion of tenant improvements.  A37 (Stip. ¶ 83).  Instead, the court's comment necessarily depends on an inference drawn from the increase in the assessed value of the Property around the time the Government took possession.[14]  The Claims Court

---

[14] In the Claims Court, the Government sought to use lease-up costs to connect the dots between completion of tenant improvements and increased assessed value, *see* A72-73, but the alleged correlation is murky, to say the least.  As an illustration, the lease-up costs increased from $8,922,880 to $11,389,552 between 2009 and 2010, even though all tenant improvements under the leases were completed and even though the assessed value also increased.  *Compare* A32 (Stip. ¶ 48), A101, *with* A32 (Stip ¶ 43), A35 (Stip. ¶¶ 70-71).  Under the Government's theory, the completion of tenant improvements should have resulted in lower lease-up costs.

adopted this inference in the Government's favor despite JLW's submission of evidence that increased market values were better explained by changing market conditions in the neighborhood, including the recent construction of Nationals Park. *See* A138. As was explained to the Claims Court, the Property's increased assessed value followed the same trajectory of the Transpoint building, a property in the very same neighborhood. A119. Thus, instead of drawing the inference in the Government's favor, the court was obligated to draw the justifiable inference in JLW's favor that the value increased because of changing market conditions.[15]

2.  The Court Adopted the Inference that Each Lease Contemplated a Fully Occupied Building with Tenant Improvements Completed Throughout the Entire Property.

The parties entered into the leases over the course of almost four years, and each of the five leases is a separate agreement. A25-25 (Stip. ¶2). Nevertheless, the Claims Court concluded that the first full assessment for purposes of *all* the leases occurred simultaneously and not until tax year 2010. A9. It reached this

---

Furthermore, the increase in lease-up costs actually observed should have resulted in a lower assessed value in 2010 under the Government's theory.

[15] For example, a change in the capitalization rate that OTR applies to the net operating income will impact value. A30-31 (Stip. ¶ 33). The capitalization rate is the ratio between the net operating income of the Property and its assessed value. A34 (Stip. ¶ 61). Mathematically speaking, a lowering of the capitalization rate results in an increase in the value of the Property. Opinion testimony offered by JLW would have expounded on the factors affecting increases in the assessed value of the Property. *See* A35-36 (Stip. ¶¶ 72-73).

conclusion despite the fact that the parties executed the first lease, Lease 01741, in June 2004 and completed the tenant improvements thereunder by January 2005. A25-26 (Stip. ¶¶ 2(a), 3(a)). In order to find that a full assessment did not occur until 2010 for any of the leases, the court necessarily inferred that the "contemplated improvements" under the first lease included tenant improvement associated with the last-executed lease, Lease 02019, in September 2008. *See* A6 n.7, A10.

No facts support this assumption. In the Claims Court, the only attempt by the Government to connect the individual leases to tenant improvements completed across the entire Property was the unsupported assertion that "both parties contemplated that tenant improvements would be completed throughout the property so that the property would be capable of maximizing its occupancy and revenue." A73. The Government offered no evidence to support this assertion, basing it instead on pure conjecture. *See id.*

The notion that the parties anticipated tenant improvements associated with Lease 02019 when they executed Lease 01741 almost four years earlier is an inference in the Government's favor and, therefore, cannot support summary judgment. Moreover, it is belied by the undisputed facts. The Government admitted that, in entering Lease 01741, the parties did not contemplate entering any future leases. A123 (Dec. 4, 2013 Tr. 25:2-5). It follows as a matter of course

that Lease 01741, and the rest of the leases for that matter, did not contemplate the completion of tenant improvements under any hypothetical future leases. The leases are for discrete portions of the Property and are not concerned with maximizing occupancy or Lessor's revenue across the entire Property.

Judgment in the Government's favor cannot depend on an unproven, generalized assumption "that tenant improvements would be completed throughout the property." A73. The Claims Court's decision is based on inferences in the Government's favor that are not only contrary to the standards governing summary judgment, but also contrary to the undisputed evidence.

>    3.    The Court Misconstrues the Nature of OTR's Lease-Up Cost Deductions.

There is no merit to the Claims Court's statement that OTR's use of lease-up costs merely indicates that there are "improvements that still need to be made to a property." A7. This misstatement echoes the court's misinterpretation of Lessor's position as advocating full assessment when OTR merely "acknowledge[s] that there are contemplated improvements to the property which have yet to be completed." A6. This is incorrect.

When it uses the income approach, OTR not only takes into account lease-up *costs* but also considers the potential *revenue* that could be generated by all rentable areas in the Property. *See* A30-31 (Stip. ¶¶ 33, 37-39). In doing so, OTR

considers *all* improvements required for the use of the assessed Property. A30
(Stip. ¶28). Thus, OTR's assessment methodology necessarily takes into account
the value associated with tenant improvements when it considers the potential
rental income that building can generate. The mere use of lease-up costs does not
prevent a full assessment. During the tax years in question, lease-up costs were
associated not only with space presumed to be vacant, but also with space
scheduled to be available within the next three years. A31 (Stip. ¶ 39). As such,
the lease-up costs represent the periodic costs a lessor must incur in order to lease
and re-lease the Property, not merely a deduction for an incomplete building as the
court inferred.

In short, lease-up costs are part of the taxing jurisdiction's consideration of
the value of the Property's income-producing improvements, not merely an
acknowledgement of "yet to be completed" tenant improvements. *See* A6. To
suggest otherwise disregards the taxing jurisdiction's methodology,
mischaracterizes Lessor's position, and draws improper inferences in the
Government's favor as to the relevance of lease-up costs.

The Claims Court's decision erroneously treats the completion of tenant
improvements as the *sine qua non* of full assessment without any basis in the lease
language or the undisputed facts. Instead, the leases unambiguously look to the

42

taxing jurisdiction, and OTR indisputably supports tax year 2007 as a full assessment.  On this record, the Claims Court's decision is incorrect.

## CONCLUSION

This Court should reverse the Claims Court's judgment in its entirety and either direct entry of summary judgment in favor of Lessor or, alternatively, vacate the judgment in favor of the Government and remand the case for further proceedings.

Respectfully submitted,


 /s/ Lynn E. Calkins
Lynn E. Calkins
Jerrold J. Ganzfried
Thomas J. McIntosh
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, D.C.  20006
Telephone:  (202) 955-3000
Facsimile:  (202) 955-5564
lynn.calkins@hklaw.com

*Counsel for Appellant*
*Jemal's Lazriv Water, LLC*

March 10, 2014

**ADDENDUM**

In accordance with Fed. Cir. R. 28(a)(12), appended hereto are (1) the Judgment entered on December 19, 2013 (A1); and (2) the Opinion and Order dated December 19, 2013 (A2-10).

# In the United States Court of Federal Claims

**No. 12-151 C**

**JEMAL'S LAZRIV WATER, LLC,**

**JUDGMENT**

    **v.**

**THE UNITED STATES**

       Pursuant to the court's Opinion and Order, filed December 19, 2013, denying Plaintiff's motion for summary judgment and granting the Government's cross-motion for summary judgment,

       IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that judgment is in favor of the Government. No costs.

                     Hazel C. Keahey
                     Clerk of Court

**December 19, 2013**      By:   s/Lisa L. Reyes

                     Deputy Clerk

<u>NOTE</u>: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of <u>all plaintiffs</u>. Filing fee is $505.00.

# In the United States Court of Federal Claims

No. 12-151C

(Filed: December 19, 2013)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*

|  |  |
|---|---|
| JEMAL'S LAZRIV WATER, LLC, | \* |
| Plaintiff, | \*  Contract Disputes Act; GSA Leases for |
|  | \*  Office Space; Tax Adjustment Clause; |
| v. | \*  Contract Interpretation; Determination |
|  | \*  of Base Year and Full Assessment; |
| THE UNITED STATES, | \*  Cross-Motions for Summary Judgment. |
| Defendant. | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*

*Lynn Estes Calkins*, Holland & Knight, LLP, Washington, D.C. for Plaintiff.

*Martin M. Tomlinson*, with whom were *Stuart F. Delery*, Assistant Attorney General, *Bryant G. Snee*, Acting Director, and *Franklin E. White, Jr.,* Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C. for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

This case arises under the Contract Disputes Act, 41 U.S.C. § 7104 and the Tucker Act, 28 U.S.C. §§ 1491(a)(1) and (2), and stems from different interpretations of a clause contained in five leases for space in an office building in Washington, D.C. Each of the five leases between Plaintiff Jemal's Lazriv Water, LLC ("Jemal's") and the General Services Administration ("GSA") includes a tax adjustment clause which states that the Government shall make a payment to Jemal's for its share of any increase in real estate taxes over the amount established as the base year taxes. Jemal's and the Government disagree as to what constitutes "the base year." Each lease defines base year taxes to include "the real estate taxes for the first 12-month period of the lease term coincident with full assessment." Joint Stipulation ("Stip.") ¶¶ 7-8.

A2

At the heart of this dispute is the meaning of the term "full assessment" in the leases. Under Plaintiff's interpretation, a full assessment occurred no later than tax year 2007. According to the Government, the property in question was not fully assessed until tax year 2010,[1] and so GSA's contracting officer denied Plaintiff's claims for payment for the Government's share of the increase in real estate taxes during the 2008, 2009, and 2010 tax years. Jemal's argues that the Government is contractually obligated to reimburse Plaintiff for the Government's share of the tax increase during these years. On March 30, 2013, Jemal's filed its complaint in this Court to recover the $2,240,884.74 plus interest it claims it is entitled to under the five leases. The matter comes before the Court on cross-motions for summary judgment. The Court heard oral argument on December 4, 2013.

<u>Factual Background</u>

Between 2004 and 2008, GSA entered into five leases with Jemal's for office space located at 1900 Half Street, S.W., Washington, DC 20024 ("the Property"). Stip. ¶ 3. GSA accepted space under two of the leases in 2005, and accepted space under the other three leases in 2006, 2007, and 2008. Id. In addition to rent, GSA was obligated to pay tax adjustments as provided in the solicitation, which was incorporated into the leases. Under the tax adjustment clause, the United States "shall 1) make a single annual lump sum payment to the Lessor for its share of any increase in real estate taxes during the lease term over the amount established as the base year taxes or 2) receive a rental credit or lump sum payment for its share of any decreases in real estate taxes during the lease term below the amount established as the base year taxes." Stip. ¶ 5.

The leases define the base year taxes as "the real estate taxes for the first 12-month period coincident with full assessment."[2] Stip. ¶¶ 7-8. According to the definition contained in the leases, the full assessment means that "the taxing jurisdiction has

---

[1] In the District of Columbia, the assessed value for all real property is the estimated market value of such property on the valuation date. This assessment is used to calculate taxes for the following tax year. For instance, if a property was assessed on January 1, 2009, this assessment would be used to calculate taxes for the 2010 tax year which began on October 1, 2009 and ended September 30, 2010.

[2] In four of the five leases, the base year taxes are defined as "1) the real estate taxes for the first 12-month period coincident with full assessment or 2) may be an amount negotiated by the parties that reflects an agreed upon base for a fully assessed value of the property." Stip. ¶ 7. Neither party argues that the parties negotiated an agreed upon base for purposes of the tax adjustment clause, and so the Court limits its attention to the first part of the definition. For purposes of the fifth lease, the base year taxes are solely defined as "the real estate taxes for the first 12-month period of the lease term coincident with full assessment." Stip. ¶ 8.

considered all contemplated improvements to the assessed property in the valuation of the same. Partial assessments for newly constructed projects or for projects under construction, conversion, or renovation will not be used for establishing the Government's base year for taxes." Stip. ¶ 10. The taxing jurisdiction for the Property is the District of Columbia's Office of Tax and Revenue ("OTR"). Stip. ¶ 26.

An OTR representative testified in a deposition that the D.C. Code obligates OTR to base its assessments on 100 percent of the market value of the property being assessed. Stip. ¶ 31. When appraising the Property, OTR used what is called the "income approach" to determine the market value. Stip. ¶ 33. The income approach is most often used when appraising a property owned for its ability to produce income to the owner. Under this approach, OTR estimates the property's potential net operating income, to which it applies a capitalization rate[3] for the class of property at issue to derive the stabilized value[4] of the property. Id. OTR then calculates the present value of lease-up costs, which is an estimated value of lost rent and the necessary tenant improvements required to lease vacant space or renew space. Stip. ¶ 39. Once calculated, the lease-up costs are subtracted from the stabilized value of the property to arrive at the assessed market value of the property. Stip. ¶ 40. The table below depicts the information provided by the parties about the building's vacant space, the lease-up costs, OTR's assessment of the value of the Property, and the annual real estate taxes during 2007-2010.

| Tax year[5] | Square feet of rentable office space available in the previous year | Lease-up costs | OTR's assessment of the value of the Property | Annual real estate taxes |
|---|---|---|---|---|
| 2007 | 471,736 | $18,086,828 | $35,668,065 | $659,859.20 |
| 2008 | 317,672 | $14,762,448 | $51,213,028 | $947,441.02 |
| 2009 | 130,336 | $8,922,880 | $95,303,032 | $1,757,106.08 |
| 2010 | 89,948 | Not provided | $121,780,000 | $2,246,930.00 |

---

[3] The capitalization rate is the rate of return on a real estate investment property based on the expected income that the property will generate. The rate is calculated by dividing the income the property will generate (after fixed costs and variable costs) by the total value of the property.

[4] Stabilized value is the value of a property after it reaches a normal occupancy rate and operating expenses.

[5] The District of Columbia tax year runs from October 1 to September 30.

No tenant improvements had been performed on any of the office space in the Property at the time GSA initially contacted Plaintiff regarding leasing a portion of the Property.  Stip. ¶ 41.  Tenant improvements were made to the Property on a lease-by-lease basis as GSA accepted the premises.  Stip. ¶ 41-43.  Plaintiff reported spending $12,841,041 on capital improvements to the Property in 2007 and $5,528,346 on capital improvements in 2008.  Stip. ¶¶ 51-52.  The final tenant improvements to the property were not completed until shortly before GSA accepted the fifth and final space in September 2008.  Stip. ¶¶ 3, 43.

The assessed value of the property increased by $86,111,935 between tax year 2007 and tax year 2010.  Stip. ¶¶ 68-71.  Pursuant to the terms of each of the five leases, Jemal's submitted tax documents to GSA seeking reimbursement for the Government's share of the increase in real estate taxes.  Stip. ¶ 11.  On January 26, 2012, GSA denied Plaintiff's certified claims submitted under the Contract Disputes Act.[6]

## Analysis

### A.  Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a) of the Rules of the Court of Federal Claims.  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary judgment will not be granted if the "evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

In reviewing a motion for summary judgment, the Court views the factual record and the inferences to be drawn from the record in the light most favorable to the non-moving party.  Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  When cross-motions for summary judgment are presented, the Court evaluates each motion on its own merits and draws reasonable inferences against the party whose motion is under consideration.  Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987).  The Court will deny both motions if a genuine issue of material fact exists.  Id.  Here, both Jemal's and the Government agree that there are no disputed issues of material fact.  This case presents an issue of contract interpretation, and as a question

---

[6]  On January 26, 2012, GSA issued formal denials on four of the five certified claims.  GSA did not issue a formal denial on the final claim within 60 days of Plaintiff's submission.  Because the CO did not reach a final decision within 60 days of that date, the claim is deemed denied.  Stip. ¶¶ 16-17.

of law, may be decided on motions for summary judgment. <u>Blackstone Consulting Inc. v. United States</u>, 65 Fed. Cl. 463, 468 (2005).

In questions of contract interpretation, the inquiry begins "with the language of the written agreement." <u>NVT Techs., Inc. v. United States</u>, 370 F.3d 1153, 1159 (Fed. Cir. 2004). The Court must construe a contract so as to "effectuate its spirit and purpose," <u>Northrop Grumman Corp. v. Goldin</u>, 136 F.3d 1479, 1483 (Fed. Cir. 1998) (quoting <u>Gould, Inc. v. United States</u>, 935 F.2d 1271, 1274 (Fed. Cir. 1991)), and a contract must be considered as a whole and interpreted in such a manner to harmonize and give reasonable meaning to all of its parts. <u>McAbee Constr., Inc. v. United States</u>, 97 F.3d 1431, 1434-35 (Fed. Cir. 1996). A contract clause is construed in order to give it the effect intended by both parties. <u>Honeywell, Inc. v. United States</u>, 661 F.2d 182, 186 (Cl. Ct. 1981).

B. <u>The Plaintiff's Interpretation of the Full Assessment Term is not Reasonable.</u>

The meaning of the full assessment term in the five leases is the legal question at the heart of the dispute before the Court. The threshold question is whether this term contains ambiguous language or supports only one reading. <u>NVT Techs.</u>, 370 F.3d at 1159. The Court begins this inquiry by examining the plain language of the contract and determining if it can reasonably be interpreted in more than one way. <u>LAI Servs., Inc. v. Gates</u>, 573 F.3d 1306, 1314 (Fed. Cir. 2009).

As expressly defined by the terms in the lease, a full assessment has occurred when the taxing jurisdiction has "considered all contemplated improvements to the assessed property in the valuation of the same." Stip. ¶ ¶ 10. Both parties assert that the term is unambiguous. The Government takes the position that "full assessment" requires OTR to consider all improvements contemplated in the lease once the improvements are completed.[7] According to the Plaintiff's interpretation, OTR has considered the contemplated improvements if OTR acknowledges that there are contemplated improvements to the property which have yet to be completed. Under Plaintiff's interpretation, a full assessment occurred no later than tax year 2007. In essence, the dispute boils down to different readings of the phrase "considered all contemplated improvements" and whether the OTR can consider improvements before the improvements have been completed.

---

[7] GSA states that the contemplated improvements were not completed until September 2008. Such improvements would have been considered in the assessment when OTR determined the estimated market value of such property on the valuation date in January 2009. This assessment would have been used to calculate taxes for tax year 2010.

5

To show an ambiguity, it is not enough that the parties differ in their respective interpretations of a contract term. Rather, both interpretations must fall within a zone of reasonableness. Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin., 169 F.3d 747, 751 (Fed. Cir. 1999). It is a fundamental tenet of contract construction that a contract should be interpreted so as not to render portions of it meaningless. Medlin Constr. Grp. v. Harvey, 449 F.3d 1195, 1201 (Fed. Cir. 2006). Here, Plaintiff's interpretation of the full assessment term renders the term meaningless. Any tax assessment by the OTR, according to Plaintiff's definition, will qualify as a full assessment because the OTR always considers the improvements that still need to be made to a property when it calculates lease-up costs. Under such an interpretation, an assessment of an empty shell of a building with no tenants would meet the definition of full assessment. If the parties intended the base year to be any year before improvements had been made there would have been no need to add the full assessment term. Plaintiff's interpretation of full assessment is unreasonable because it renders the term meaningless. See Medlin, 449 F.3d at 1201 (finding the government's interpretation of a provision unreasonable because it would render portions of the contract meaningless). Thus, the full assessment term is unambiguous because only the Government's interpretation of the term is reasonable.

C. The Government's Interpretation Comports with the Intent and Purpose of the Full Assessment Term.

The ultimate aim of contract interpretation is to arrive at a definition that most clearly reflects the original intentions of the parties. Alliant Techsystems Inc. v. United States, 74 Fed. Cl. 566, 576 (2007). The intent of the parties is determined by a review of the contract, and if necessary, other objective evidence. Flexfab, LLC v. United States, 424 F.3d 1254, 1262 (Fed. Cir. 2005). Thus, the Court analyzes the parties' intentions regarding the full assessment term based upon the language of the lease and secondary sources on the use of tax escalation clauses.

Plaintiff has submitted a declaration from the former Chief Assessor of OTR, David Fitzgibbon, which states that as part of its assessment methodology, OTR considers all improvements required for the use of the assessed property. Such a fact is far from dispositive. The full assessment term is a contractual term used by the parties, and is not automatically dependent upon the labels used by the taxing jurisdiction to describe its assessment methodology. Rather, the Court must construe the term in a manner that gives effect to the parties' intentions. Here, the parties included the following sentence after the express definition of full assessment: "Partial assessments for newly constructed projects or for projects under construction, conversion, or renovation will not be used for establishing the Government's base year for taxes." Stip. ¶ 10. The inclusion of this sentence strongly suggests a recognition by the parties that

6

partial assessments were inappropriate for determining the base year because partial assessments would render the base period arbitrarily low and make the lessee liable for a sudden rise in taxes.

Indeed, a review of secondary sources on tax escalation clauses reinforces the Government's position that the full assessment term requires OTR to consider all improvements contemplated in the lease once the improvements are completed. Tax escalation clauses are regularly used in leases to share risks between the lessor and lessee. If taxes rise during the term of the lease, the lessor can pass on increases in real estate property taxes to the lessee in proportion to the space occupied by the lessee. Kimbrell v. Fischer, 15 F.3d 175, 176-77 (Fed. Cir. 1994). On the other hand, if taxes fall during the term of the lease, the lessee can share in the tax savings. However, tax escalation clauses contain a widely recognized trap for a lessee. If a lessee enters a lease while the property is undergoing major improvements, the taxing authority will consider the improvements that still need to be made to the property and subtract them from the stabilized value of the property to arrive at the assessed market value. This renders the base period artificially low and exposes the lessee to the risk of significant tax escalation as the improvements are completed. See, e.g., William F. Treanor, Challenges to Rent Escalation Clauses in Commercial Leases, Prob. & Prop., May/June 1990, at 6-7. For this reason, sophisticated tenants like the GSA, when negotiating with sophisticated lessors like Jemal's, often insist on the inclusion of a term explicitly stating that the tax escalation clause shall not apply until the leased premises have been assessed by the taxing authority as fully improved. Otherwise, the increases in taxes will not reflect normal tax increases but rather the gradual completion of improvements to the building. See, e.g., 2 Real Estate Leasing Practice Manual § 48:17. Thus, Plaintiff's interpretation frustrates both the intent and purpose of the term. Conversely, the Government's interpretation gives meaning to the term in light of the parties' intent at the time they entered into the agreement.

D. Precedent for the Government's Interpretation is Found in Opinions from this Court and Administrative Boards.

Not only does the Government's interpretation comport with the plain language of the lease term and with common sense, but the Government's interpretation also is consistent with the way other courts have interpreted similar terms. For instance, in Appeal of Otto K. Wetzel Landmark Ctr., the General Services Board of Contract Appeals ("GSBCA") recognized that the full assessment term protected GSA from having to pay for significant tax increases that were the result of improvements to other tenant spaces. GSBCA No. 7466, 85-2 B.C.A. (CCH) ¶ 18099 (Apr. 30, 1985). The GSBCA defined "full assessment" as the completion of "all improvements contemplated

7

by the lessor to the assessed property," and explained that "this tax escalation clause is not to be interpreted to hold respondent responsible for tax increases resulting from improvements to other tenant spaces in the Center." Id. at *3. Likewise, in Kimbrell v. Fischer, the Federal Circuit adopted the GSBCA's analysis and reasoning in Wetzel, and found that full tax assessment meant assessment after all improvements contemplated in the lease were made. 15 F.3d at 177.

Jemal's notes that the present case can be distinguished from Kimbrell and Wetzel because the leases at issue in those cases did not contain an express definition of full assessment, while the term is defined in the lease between Jemal's and the GSA. However, this is a distinction without a difference. The GSBCA's underlying reasoning in Wetzel applies here—the Government should not have to pay for tax increases resulting from improvements to other tenant spaces in the Property.

Furthermore, support for GSA's interpretation that "full assessment" can only occur after contemplated improvements have been completed is found in a recent case from this Court involving an identical term. Like the present case before the Court, the parties in Alpena Marc, LLC v. United States disagreed over what constituted the base year for purposes of the tax escalation clause. 108 Fed. Cl. 200 (2012). The lease in Alpena Marc contained a tax adjustment clause in ¶ 3.4 with the exact same definition of "full assessment" that is in the lease between GSA and Jemal's. The dispute over the base year in Alpena Marc stemmed from the fact that there was a patent ambiguity between the terms in ¶ 3.4 and a separate term in the lease that said 2005 was the base year.

While the issue in Alpena Marc differs from what is before the Court now, it is significant that Judge Christine O.C. Miller interpreted the phrase "considered all contemplated improvements" to mean considered all completed improvements. The property at issue in Alpena Marc required substantial renovations before it would meet the Government's requirements. In analyzing the two conflicting terms, Judge Miller wrote, "the court agrees with defendant that ¶ 3.4.B. defines 'base year taxes' as the real estate taxes for the twelve-month period that corresponds to the first full assessment of *the renovated property*." Id. at 206 (emphasis added). Judge Miller's use of the phrase "renovated property" suggests that full assessment has occurred after the contemplated improvements have been completed. Applying that reasoning to the case before the Court, the base year would be 2010.

8

A9

E. <u>Full Assessment did not Occur until Tax Year 2010 after the Improvements Contemplated in the Lease were Completed.</u>

Finding 2007 as the base year would penalize the Government for being the first tenant to accept space in a vacant building in need of improvements.  This result was certainly not the parties' intention when they included the tax adjustment clause in the leases.  On the contrary, the primary purpose of the full assessment term was to ensure that the Government was not responsible for paying tax increases due to tenant improvements to other tenant spaces.  Here, the assessed value of the property increased 241 percent between tax year 2007 and tax year 2010.  It is possible that the property rose in value, in part, due to external conditions in the market place—such as the fact that the Property is located in close proximity to the newly constructed Nationals Baseball Park in Washington, D.C.  However, it is also true that the Property experienced a jump in value because OTR's 2007 assessment was of a completely vacant building in need of significant improvements to attract tenants.  Not surprisingly, such improvements increased both the value of the building and the taxes assessed by OTR.  This type of tax increase is precisely what the full assessment term is designed to prevent as a charge to the lessee.

Accordingly, the Court finds that the first tax year for which OTR could have possibly considered the completed improvements in its valuation of the property was tax year 2010, which ran from October 1, 2009 through September 30, 2010.  It was then that OTR was able, for the first time, to fully incorporate into its valuation of the property the fact that all of the contemplated improvements had been completed.

Conclusion

For the reasons set forth above, Plaintiff's motion for summary judgment is DENIED and the Government's cross-motion for summary judgment is GRANTED.  The Clerk of the Court shall enter final judgment for the United States.  No costs.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge

9

A10

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of March, 2014, a copy of the

Brief of Appellant was served by electronic means, using the Court's CM/ECF

system, on the following:

> Martin M. Tomlinson
> U.S. Department of Justice
> Commercial Litigation Branch
> P.O. Box 480
> Ben Franklin Station
> Washington, D.C.  20044
> Martin.M.Tomlinson@usdoj.gov

 /s/ Lynn E. Calkins
Lynn E. Calkins
*Counsel for Appellant*
*Jemal's Lazriv Water, LLC*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).   The  brief  contains  9,690  words,  excluding  the  parts  of  the  brief exempted by Fed. R. App. P.  32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

2.      This brief complies with the typeface requirements of  Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P.  32(a)(6).  The brief has  been  prepared  in  a  proportionally-spaced  typeface  (Times  New  Roman,  14-point font) using Microsoft Office Word 2007.


 /s/ Lynn E. Calkins
Lynn E. Calkins
*Counsel for Appellant*
*Jemal's Lazriv Water, LLC*